# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# PECOS DIVISION

ATTORNEY GENERAL OF TEXAS *et al.*,

    Plaintiffs,

v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

    Defendants.

No. 4:24-cv-49-DC-DF

## DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW I. WARDEN
Assistant Branch Director

STEPHEN M. PEZZI
 Senior Trial Counsel
DANIEL RIESS
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8576 (Pezzi)
Tel: (202) 353-3098 (Riess)
Email: stephen.pezzi@usdoj.gov
Email: daniel.riess@usdoj.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 2

    I.    The Creation of SAVE ................................................................................................ 2

    II.    The Use of SAVE for Voter Verification ................................................................... 3

    III.    Improvements and Modernization of SAVE .............................................................. 4

    IV.    Texas's Use of SAVE .................................................................................................. 5

    V.    Recent Developments in SAVE-Related Litigation ................................................... 6

LEGAL STANDARD ..................................................................................................................... 8

ARGUMENT .................................................................................................................................. 9

    I.    This case should be dismissed as moot ....................................................................... 9

        A.    Texas challenges a version of SAVE that no longer exists ................................ 9

        B.    Defendants have already provided all the relief requested in Texas's
            complaint. ......................................................................................................... 11

        C.    Defendants have made a judicially enforceable commitment
            to maintain the recent improvements to SAVE ................................................ 12

    II.    In the alternative, at a minimum, Texas should be ordered to file a new complaint .. 14

CONCLUSION ............................................................................................................................. 14

# **TABLE OF AUTHORITIES**

**CASES**

*Ali v. Cangemi*,
  419 F.3d 722 (8th Cir. 2005) ..................................................................................................9

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) ..................................................................................................................8

*Alvarez v. Smith*,
  558 U.S. 87 (2009) ..................................................................................................................8

*Arizonans for Official Eng. v. Arizona*,
  520 U.S. 43 (1997) ..................................................................................................................8

*Chamber of Com. of U.S. of Am. v. U.S. Dep't of Energy*,
  627 F.2d 289 (D.C. Cir. 1980) ............................................................................................8, 9

*Church of Scientology v. United States*,
  506 U.S. 9 (1992) ....................................................................................................................8

*Cinel v. Connick*,
  15 F.3d 1338 (5th Cir. 1994) ................................................................................................14

*FBI v. Fikre*,
  601 U.S. 234 (2024) .........................................................................................................12, 13

*Gordon v. City of Houston*,
  79 F. Supp. 3d 676 (S.D. Tex. 2015) .....................................................................................2

*League of Women Voters v. DHS*,
  2025 WL 3198970 (D.D.C. Nov. 17, 2025) ..........................................................................7

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) ..............................................................................................................12

*Mills v. Green*,
  159 U.S. 651 (1895) ................................................................................................................8

*Princeton University v. Schmid*,
  455 U.S. 100 (1982) ................................................................................................................8

*Ramming v. United States*,
  281 F.3d 158 (5th Cir. 2001) ..................................................................................................2

*Staton Techiya, LLC v. Samsung Elecs. Co.*,
  757 F. Supp. 3d 697 (E.D. Tex. 2024) ...................................................................................8

*Texas v. HHS*,
   No. 23-cv-22-DC, 2024 WL 1493809 (W.D. Tex. Apr. 5, 2024) ............................................. 12

*United States v. Sanchez-Gomez*,
   584 U.S. 381 (2018) ............................................................................................................ 8

**STATUTES**

8 U.S.C. § 1373 ...................................................................................................................... *passim*

8 U.S.C. § 1644 ............................................................................................................................. 4

52 U.S.C. § 21083(a)(4) ............................................................................................................... 3

**RULES**

Federal Rule of Civil Procedure 12(b)(1) ............................................................................. 2, 14

**LEGISLATIVE MATERIALS**

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
   Pub. L. No. 104-208, Div. C, 110 Stat. 3009 (1996) ............................................................ 3

Immigration Reform and Control Act of 1986,
   Pub. L. No. 99-603, § 121(a)(1)(C), 100 Stat. 3359 (1986) ................................................. 2

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
   Pub. L. No. 104-193, 110 Stat. 2105 (1996) ........................................................................ 3

**EXECUTIVE MATERIALS**

Executive Order 14,158, *Establishing and Implementing the President's "Department of Government Efficiency"*,
   90 Fed. Reg. 8441 (Jan. 20, 2025) ........................................................................................ 4

Executive Order 14,243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*,
   90 Fed. Reg. 13,681 (Mar. 20, 2025) .................................................................................... 4

Executive Order 14,248, *Preserving and Protecting the Integrity of American Elections*,
   90 Fed. Reg. 14,005 (Mar. 25, 2025) ................................................................................ 4, 7

**OTHER AUTHORITIES**

*After Gaining Access to SAVE Database, Secretary Nelson Refers Potential Noncitizen Voting Cases for Investigation* (June 5, 2025),
   https://perma.cc/T3Z8-JN3X ............................................................................................... 10

Office of the Tex. Sec. of State (@TXsecofstate), X (Apr. 25, 2025, at 20:11 ET),
   https://perma.cc/DSG2-9TKR .............................................................................................. 10

Sec. Jane Nelson (@SecJaneNelson), X (Oct. 22, 2025, at 12:00 ET),
    https://perma.cc/VP3C-ZB5H ...................................................................................... 11

*Texas Completes Citizenship Verifications in the SAVE Database* (Oct. 20, 2025),
    https://perma.cc/2XXC-HZXD ............................................................................. 2, 6, 11

USCIS, *About SAVE*,
    https://perma.cc/5888-TH46 ........................................................................................ 2

USCIS, *About SAVE: History*,
    https://perma.cc/MG5B-MCZH ................................................................................. 3

USCIS, *Guide to Understanding SAVE Verification Responses* (Apr. 2022),
    https://perma.cc/BW9M-WJUT .................................................................................. 3

USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload*
    (May 22, 2025),
    https://perma.cc/LM3N-RB76 ................................................................................ 4, 5

USCIS Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025),
    https://perma.cc/Y8A5-YX3M ..................................................................................... 5

## **INTRODUCTION**

This case is moot. The United States agrees with Texas that the integrity of elections is a matter of the utmost importance. And despite some past disagreements, currently, leadership at the Department of Homeland Security (DHS) and United States Citizenship and Immigration Services (USCIS) are aligned with Texas about the important role that DHS and USCIS can play in verifying citizenship and immigration status of registered voters. But in part for that reason, there is no longer any case or controversy for this Court to resolve, and this case should be dismissed.

Federal law has long provided that DHS "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). To fulfill that obligation, DHS (through its component, USCIS) uses (among other tools) the Systematic Verification for Alien Entitlements (SAVE) program. Until recently, however, SAVE had significant technical limitations that made it difficult to use in verifying eligibility of registered voters. That is the core premise of Texas's complaint—which alleged, in October of 2024, that SAVE was insufficient to satisfy 8 U.S.C. § 1373(c), and that USCIS had failed to respond to Texas's verification requests for citizenship verification of roughly 450,000 Texas voters.

Things look very different today. The version of SAVE that is described in Texas's complaint no longer exists, now that USCIS has completed significant improvements and modernization efforts. That includes allowing bulk case uploads (instead of inputting requests one-by-one), elimination of all fees for State users, increased data-sharing with the Social Security Administration and the Department of State (thus allowing for searches without a DHS-specific immigration identifier), and more.

And so, at least outside of this litigation, Texas now speaks glowingly about SAVE. In the words of Texas Secretary of State Jane Nelson—who submitted more SAVE voter-verification requests in 2025 than anyone else in the United States—"[t]he Trump Administration's decision to give states free and direct access to this data set for the first time has been a game changer, and we appreciate the partnership with the federal government to verify the citizenship of those on our voter

rolls and maintain accurate voter lists." *Texas Completes Citizenship Verifications in the SAVE Database* (Oct. 20, 2025), https://perma.cc/2XXC-HZXD. Texas reports that it has now "run[] the entire Texas voter list with more than 18 million voters through the SAVE database." *Id.*

As a result of these changed circumstances, the United States has now executed a settlement agreement with four States—Florida, Ohio, Iowa, and Indiana—which each brought materially identical suits as this one. That agreement is subject to enforcement by the U.S. District Court for the Northern District of Florida (Wetherell, J.), for (at least) the next 20 years. So, were there any doubt about the lasting nature of the recent improvements to SAVE, those doubts have now been erased.

Accordingly, this Court should dismiss this case as moot, in its entirety, without prejudice, for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). In the alternative, at a minimum, Texas should be ordered to file an amended or supplemental complaint—a complaint that would articulate Texas's theory (if any) as to how the *current* version of SAVE could possibly be unlawful, if that is Texas's view.

## BACKGROUND[1]

### I. The Creation of SAVE

The Systematic Alien Verification for Entitlements (SAVE) program was created by Congress in 1986, as part of the Immigration Reform and Control Act of 1986. *See* Pub. L. No. 99-603, § 121(a)(1)(C), 100 Stat. 3359, 3384-86 (1986). Today, SAVE "is an online service administered by" USCIS "that provides point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies." USCIS, *About SAVE*, https://perma.cc/5888-TH46. Over "1,200 agencies nationwide use SAVE to support their benefit eligibility and licensing

---

[1] Generally, in considering a Rule 12(b)(1) motion, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *see also, e.g.*, *Gordon v. City of Houston*, 79 F. Supp. 3d 676, 680 (S.D. Tex. 2015) ("A factual attack challenges the existence of subject matter jurisdiction in fact—irrespective of the pleadings—and matters outside the pleadings—such as testimony and affidavits—are considered."). Here, Defendants have offered some factual material outside of the pleadings, though Defendants' expectation is that all material facts will be undisputed.

2

determinations." *Id.* The purpose of SAVE is to carry out congressional intent to "[h]elp[] ensure that only applicants who are eligible for benefits and licenses receive them." *Id.*

In 1996, SAVE took on greater importance, because of two new congressional enactments. First, in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, Congress "restructured the welfare system in the United States and restricted immigrant eligibility for public benefits," thus "expanding the need for benefit-granting agencies to verify immigration status." USCIS, *About SAVE: History*, https://perma.cc/MG5B-MCZH. Second, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, 110 Stat. 3009 (1996), for the first time, Congress placed a legal "obligation" on what was then the Immigration and Naturalization Service (now, DHS) to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c).

## II.     The Use of SAVE for Voter Verification

Congress also requires States to "ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4). And so, since the mid-2000s, in carrying out these statutory obligations, some (but not all) States entered into agreements with USCIS to use SAVE to confirm the citizenship or immigration status of voters within their jurisdiction.

For many years, however, SAVE suffered from significant information-technology limitations when used for this purpose. Most significantly, until recently, SAVE could not verify immigration status without a DHS-specific immigration identifier, such as an "A-Number," which many voters do not have. *See* USCIS, *Guide to Understanding SAVE Verification Responses* (Apr. 2022), https://perma.cc/BW9M-WJUT; *accord* Compl. ¶¶ 48-49; Ex. 1, Decl. of Brian Broderick ¶ 18 ("Broderick Decl."). SAVE could not run searches based on other federal government documentation, such as a (full or partial) Social Security number or a passport number. *See* Compl. ¶ 48; Broderick Decl. ¶¶ 18, 20. SAVE could not verify any information at all of those individuals— including many U.S. citizens, born in the United States—who had never had any encounter with DHS

3

and thus did not appear in DHS records. *See* USCIS, *Guide to Understanding SAVE Verification Responses* (Apr. 2022); *see also* Compl. ¶ 47; Broderick Decl. ¶ 19. SAVE could only accept one verification request at a time, rather than accepting multiple requests uploaded together in bulk. *See* USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025), https://perma.cc/LM3N-RB76; Broderick Decl. ¶ 17. And SAVE charged a fee for every individual verification request. Compl. ¶ 50; Broderick Decl. ¶ 16.

Dissatisfied with those limitations, between October of 2024 and April of 2025, five different States sued the federal government—including Texas, in this case—arguing that DHS and USCIS were violating 8 U.S.C. §§ 1373 and 1644 due to the inability of SAVE to provide useful responses to many of their verification requests. *See* Compl. (filed Oct. 22, 2024); *see also Florida v. DHS*, No. 24-cv-00509 (N.D. Fla., filed Oct. 16, 2024); *Ohio v. DHS*, No. 24-cv-283 (S.D. Ohio, filed Oct. 24, 2024); *Bird v. Noem*, No. 24-cv-423 (S.D. Iowa, filed Dec. 3, 2024); *Indiana v. DHS*, No. 25-cv-732 (S.D. Ind., filed Apr. 16, 2025); Broderick Decl. ¶ 25.

### III. Improvements and Modernization of SAVE

In his second term, President Trump has made it a priority to modernize and improve outdated government information-technology systems. On Inauguration Day, President Trump signed Executive Order 14,158, *Establishing and Implementing the President's "Department of Government Efficiency"*, 90 Fed. Reg. 8441 (Jan. 20, 2025). That Order "establishe[d] the Department of Government Efficiency to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id.* § 1.

A few months later, President Trump signed Executive Order 14,243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, 90 Fed. Reg. 13,681 (Mar. 20, 2025). That Order found that "[r]emoving unnecessary barriers to Federal employees accessing Government data and promoting inter-agency data sharing are important steps toward eliminating bureaucratic duplication and inefficiency while enhancing the Government's ability to detect overpayments and fraud." *Id.* § 1.

On March 25, 2025, President Trump signed Executive Order 14,248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14,005 (Mar. 25, 2025). The Order notes that, unlike

4

many "modern, developed nations," the United States "largely relies on self-attestation for citizenship" in registering voters. *Id.* § 1. The Order acknowledges that federal law already "require[s] States to maintain an accurate and current Statewide list of every legally registered voter in the State," and that DHS "is required to share database information with States upon request so they can fulfill this duty." *Id.* (citing 8 U.S.C. § 1373(c)). To that end, the Executive Order provides that the "Commissioner of Social Security shall take all appropriate action to make available the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered." *Id.* § 3(a).

On April 22, 2025, DHS announced that it had begun "a comprehensive optimization of the Systematic Alien Verification for Entitlements (SAVE) database to ensure a single, reliable source for verifying non-citizen status nationwide." USCIS Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M. The update "eliminates fees for database searches, breaks down silos for accurate results, streamlines mass status checks, and integrates criminal records, immigration timelines, and addresses." *Id.* And on May 22, 2025, DHS announced that "[u]sers are now able to create cases using a Social Security number (SSN) as the applicant's enumerator," and also that "users may now create cases in bulk." USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025), https://perma.cc/LM3N-RB76.

## IV.   Texas's Use of SAVE

Until recently, unlike many other States, Texas did not use SAVE for voter-verification purposes. Nonetheless, just before the 2024 election, on September 18, 2024, Texas's Secretary of wrote to USCIS requesting "assistance in verifying or ascertaining the citizenship or immigration status of certain individuals on the State of Texas's voter rolls." Compl. ¶ 42; *see also* Nelson Letter (Sept. 18, 2024), ECF No. 1-1; Broderick Decl. ¶ 33. And on October 7, 2024, the Attorney General of Texas reiterated the same request in a different letter. Compl. ¶ 51; *see also* Paxton Letter (Oct. 7, 2024), ECF No. 1-3; Broderick Decl. ¶ 34.

5

On October 10, 2024, the Director of USCIS responded that Texas should submit its request through SAVE, which "is the most secure and efficient way to reliably verify an individual's citizenship or immigration status, including for verification regarding voter registration and/or voter list maintenance." Compl. ¶ 44; *see also* Jaddou Letter (Oct. 10, 2024), ECF No. 1-2; Broderick Decl. ¶ 35. The USCIS Director also explained that USCIS "currently cannot offer an alternative process to any state." Compl. ¶ 44. Texas then filed this suit on October 22, 2024, just before Election Day. Texas did not seek any form of time-sensitive relief.

After the change in Administration, on March 12, 2025, Texas executed an agreement with USCIS that would allow it to use SAVE for voter-verification purposes for the first time. Ex. 2, Texas-USCIS Mem. of Agreement; Broderick Decl. ¶ 37. On April 21, 2025, the Office of the Texas Secretary of State submitted its first SAVE verification request. Broderick Decl. ¶ 38. On May 1, 2025, the Texas Secretary of State submitted Texas's first bulk upload request, with USCIS providing technical support. *Id.* ¶ 39. And on August 11, 2025, USCIS invited Texas (along with four other States) to participate in a "soft launch" of SAVE's new functionality to allow verification requests using only a partial (*i.e.*, last-four-digits) Social Security number. *Id.* ¶ 40.

Since then, at least when it comes to voter verification, the Texas Secretary of State has been the most prolific SAVE user in the United States—having submitted more than double the number of requests of the second-place user. *Id.* ¶ 45. In three tranches in late-August and early-September 2025, Texas submitted approximately 3.38 million, then 8 million, then 6.2 million SAVE queries via SAVE's new bulk upload capability. *Id.* ¶¶ 41-43. And so, according to a press release issued by the Texas Secretary of State, Texas has now "run[] the entire Texas voter list with more than 18 million voters through the SAVE database." *Texas Completes Citizenship Verifications in the SAVE Database* (Oct. 20, 2025), https://perma.cc/2XXC-HZXD.

V.   **Recent Developments in SAVE-Related Litigation**

On November 28, 2025, in *Florida v. DHS*, 3:24-cv-509 (N.D. Fla.), plaintiff Florida filed an amended complaint to add the States of Ohio, Indiana, and Iowa as additional plaintiffs in its SAVE-related lawsuit. *Florida* ECF No. 29. All parties in *Florida* then executed a settlement agreement, which

6

generally requires USCIS to maintain the essential features of the new and improved SAVE system. *See* Ex. 3, *Florida* Settlement Agreement. The plaintiffs in *Florida* then filed an unopposed motion to dismiss, *Florida* ECF No. 30 (attaching the settlement agreement), and Judge Wetherell granted that motion a few days later, *Florida* ECF No. 31. The order of dismissal in *Florida* specified (at the parties' request) that "the Court retains jurisdiction over this case for a period of twenty years from the date of this order for the purpose of enforcement of the parties' settlement agreement, which is approved by and incorporated by reference into this order." Ex. 4, Order, *Florida* ECF No. 31.

After the *Florida* settlement, in *Ohio v. DHS*, 3:24-cv-283 (S.D. Ohio) (ECF No. 19) and *Indiana v. DHS*, 25-cv-732 (S.D. Ind.) (ECF No. 29), plaintiffs filed notices of voluntary dismissal. And in *Bird v. Noem*, 4:24-cv-423 (S.D. Iowa) (ECF No. 23), the parties filed a joint stipulation of dismissal.

Meanwhile, in the District of Columbia, new plaintiffs filed a lawsuit on September 30, 2025: *League of Women Voters v. DHS*, 1:25-cv-03501 (D.D.C.). Those plaintiffs challenge (among other things) some of DHS's recent improvements to SAVE, primarily on the theory that they violate the Privacy Act. The United States is vigorously defending that suit, and the district court recently denied plaintiffs' motion for preliminary relief. *See League of Women Voters v. DHS*, 2025 WL 3198970 (D.D.C. Nov. 17, 2025). Texas moved to intervene. *League of Women Voters* ECF No. 43. The United States opposed Texas's motion for intervention as of right (because the United States adequately represents Texas's interests) but took no position on permissive intervention. *League of Women Voters* ECF No. 50. The district court has not yet decided Texas's motion. Plaintiffs in that case intend to file an amended complaint on January 21, 2026. *League of Women Voters* Minute Order (Dec. 11, 2025).

In *DNC v. Trump*, No. 25-cv-952-CKK (D.D.C.), the plaintiffs challenge various provisions of Executive Order No. 14,248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025). In summary-judgment briefing in that case, plaintiffs have raised some arguments relating to SAVE, such as whether the current version complies with the Privacy Act. Briefing is ongoing. The United States is also vigorously defending that suit.

Finally, in *this* case, Defendants sought and obtained a series of extensions—originally, to allow for new leadership at DHS and USCIS to consider these issues anew and, eventually, to allow the

7

parties to engage in settlement discussions (which were then delayed by the lapse in appropriations). Unfortunately, despite having reached an agreement to resolve materially identical lawsuits filed by Florida, Ohio, Iowa, and Indiana, the United States has been unable to reach an agreement with Texas, and settlement discussions have now concluded. Defendants now move to dismiss.

## **LEGAL STANDARD**

Federal courts only possess jurisdiction to resolve "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "[A]n actual controversy must be extant at all stages of review . . . ." *Arizonans for Official Eng. v. Arizona*, 520 U.S. 43, 67 (1997) (citation omitted). Thus, a "case that becomes moot at any point during the proceedings is 'no longer a "Case" or "Controversy" for purposes of Article III,' and is outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 584 U.S. 381, 385-86 (2018) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)).

A case has become moot when "the parties lack a legally cognizable interest in [its] outcome." *Already*, 568 U.S. at 91 (citation omitted). That is true if an intervening event "makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party." *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 655 (1895)). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'" *Already*, 568 U.S. at 91 (quoting *Alvarez v. Smith*, 558 U.S. 87, 93 (2009); *see also Princeton University v. Schmid*, 455 U.S. 100, 103 (1982) (per curiam) (holding that where a challenged policy was superseded by a new policy, "the issue of the validity of the old regulation is moot, for this case has 'lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract questions of law'") (citation omitted).

"Courts recognize two types of mootness: constitutional and prudential." *Staton Techiya, LLC v. Samsung Elecs. Co.*, 757 F. Supp. 3d 697, 706 (E.D. Tex. 2024). "Constitutional mootness derives from Article III of the U.S. Constitution while prudential mootness is derived from equity." *Id.* (citing *Chamber of Com. of U.S. of Am. v. U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980)). "[P]rudential mootness, '[t]he cousin of the mootness doctrine, in its strict Article III sense, is a melange of doctrines

8

relating to the court's discretion in matters of remedy and judicial administration.'" *Id.* (quoting *Ali v. Cangemi*, 419 F.3d 722, 724 (8th Cir. 2005)). "Even if a court has jurisdiction under Article III to decide a case, prudential concerns may militate against the use of judicial power, *i.e.*, the court 'should treat [the case] as moot for prudential reasons.'" *Id.* (quoting *Cangemi*, 419 F.3d at 724).

## ARGUMENT

The version of SAVE that is described in Texas's complaint no longer exists. Instead, SAVE now has all the capabilities that Texas originally demanded, and more. All of Texas's requests for relief have been fulfilled. And now that the United States has made a contractual commitment to maintain the essential features of the current version of SAVE—a commitment that is enforceable by a federal court for (at least) the next 20 years—there is no basis to speculate that the injuries alleged in Texas's complaint will recur any time soon, if ever. Accordingly, this case should be dismissed as moot. Alternatively, at a minimum, for prudential and equitable reasons, Texas should be ordered to file an amended or supplemental complaint—which would have to include Texas's theory (if any) about how the *current* version of SAVE is unlawful, if that is what Texas believes.

### I. THIS CASE SHOULD BE DISMISSED AS MOOT.

#### A. Texas challenges a version of SAVE that no longer exists.

The original premise of this lawsuit was that, due to certain limitations, SAVE "is not an adequate tool, on its own, for a state seeking to verify the citizenship status of an individual on the voter roll." Compl. ¶ 47. According to Texas's complaint, those limitations are as follows:

- SAVE does not verify citizenship status, instead, it is only "designed to confirm a person's lawful presence in the United States." *Id.*

- SAVE "requires the use of, among other things, a unique DHS-issued immigration identifier." *Id.* ¶ 48.

- To use SAVE, "USCIS charges users a fee for each verification submitted to the SAVE system." *Id.* ¶ 50.

Whether or not some or all of that was true at the time of the complaint, all that matters now is that none of it is true today. Instead, as explained in the Broderick Declaration, DHS has made massive

improvements to SAVE since the start of the second Trump Administration—resolving all the issues above, and many more. In short, the version of SAVE described in Texas's complaint bears little resemblance to the version of SAVE that is in effect today:

| Texas's Complaint | Current Status |
|---|---|
| SAVE "requires the use of, among other things, a unique DHS-issued immigration identifier." Compl. ¶ 48. | SAVE does not require the use of a unique DHS-issued immigration identifier. For example, users can now search based on Social Security number (full, or last-four-digits). *See* Broderick Decl. ¶ 21(d), (e), (i). |
| To use SAVE, "USCIS charges users a fee for each verification submitted to the SAVE system." Compl. ¶ 50. | SAVE offers free service for state, territorial, tribal, and local government agencies. *See* Broderick Decl. ¶ 21(a). |
| SAVE does not verify citizenship status, instead, it is only "designed to confirm a person's lawful presence in the United States." Compl. ¶ 47. | SAVE can verify either citizenship or immigration status, including for natural born or naturalized U.S. Citizens. *See* Broderick Decl. ¶ 21(e). |
| No allegations about this issue in the complaint. | SAVE can now handle bulk submission of verification requests for millions of individuals at one time. *See* Broderick Decl. ¶ 21(b). |

Texas's complaint has thus been overtaken by events.

At least outside the context of litigation, Texas has acknowledged—and repeatedly praised—these improvements. For example, on April 25, 2025, an official social-media account of the Office of the Texas Secretary of State posted that Texas "applaud[s] the Department of Homeland Security's decision to provide [SAVE] access to all states free of charge. . . . Thank you, @DHSgov." Office of the Tex. Sec. of State (@TXsecofstate), X (Apr. 25, 2025, at 20:11 ET), https://perma.cc/DSG2-9TKR. On June 5, 2025, Texas Secretary of State Jane Nelson said that "[g]aining access to this database has been a game-changer," and emphasized that "Texas was among the first states to log in and recently joined a pilot program working with DHS, USCIS and DOGE to improve the database's functionality." *After Gaining Access to SAVE Database, Secretary Nelson Refers Potential Noncitizen Voting Cases for Investigation* (June 5, 2025), https://perma.cc/T3Z8-JN3X. On October 20, 2025, Secretary Nelson again used the phrase "game changer," and praised Texas's "partnership with the federal government to verify the citizenship of those on our voter rolls and maintain accurate voter lists."

10

*Texas Completes Citizenship Verifications in the SAVE Database* (Oct. 20, 2025), https://perma.cc/2XXC-HZXD. And on October 22, 2025, Secretary Nelson posted a letter from President Trump, stating that she was "[h]onored to be recognized by our President as one of the first Secretaries of State to step up and protect the integrity of our elections by using the federal SAVE database." Sec. Jane Nelson (@SecJaneNelson), X (Oct. 22, 2025, at 12:00 ET), https://perma.cc/VP3C-ZB5H.

Texas's real-world satisfaction with SAVE confirms that the version described in Texas' complaint no longer exists—and thus, that this case is now moot.

### B. Defendants have already provided all the relief requested in Texas's complaint.

There is another straightforward reason why this case is moot: the relief requested in Texas's complaint has already been provided. In its Prayer for Relief, Texas's primary request was for this Court to "[o]rder Defendants to promptly provide the immigration and citizenship status of each person on the list provided by the Attorney General of Texas in its October 7, 2024 letter," as well as a "writ of mandamus" ordering the same. Compl., Prayer for Relief ¶¶ (a), (c). But according to the Texas Secretary of State, Texas has already "run[] the entire Texas voter list with more than 18 million voters through the SAVE database." *Texas Completes Citizenship Verifications in the SAVE Database* (Oct. 20, 2025), https://perma.cc/2XXC-HZXD. So those verification requests (and many millions more) have already been fulfilled. There is thus nothing left for this Court to order.

Texas's only other quasi-substantive request for relief was for the Court to "[d]eclare that Plaintiffs are entitled to prompt responses to inquiries under 8 U.S.C. § 1373." Compl., Prayer for Relief ¶ (b). On that question, it is far from clear that there was *ever* a live dispute between the parties—at least stated at that level of generality. Regardless, there is certainly no live dispute now. Defendants agree that States are entitled to "responses to inquiries 8 U.S.C. § 1373"—after all, that is what the statute says. And although Congress did not use the word "prompt," it is undisputed that Texas has submitted and USCIS has now processed *millions* of verification requests—requests that are now routinely fulfilled by USCIS "within a few seconds," as happened here. Broderick Decl. ¶ 12; *see also id.* ¶ 41 (3.38 million requests from Texas on August 22, 2025); *id.* ¶ 42 (8 million on August 29, 2025); *id.* ¶ 43 (6.2 million on September 5, 2025). So there is no practical need (and no legal basis) for the

11

Court to issue declaratory relief about USCIS's response time—even setting aside the fact that the text includes no such requirement. *See* 8 U.S.C. § 1373(c) (requiring DHS to "respond to an inquiry by a Federal, State, or local government agency . . . by providing the requested verification or status information," but saying nothing about the speed of that response); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (to justify a declaratory judgment "the dispute" must "be definite and concrete, touching the legal relations of parties having adverse legal interests," and be "real and substantial," and "admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts") (cleaned up).

In short, USCIS has already done everything that Texas asked for in its complaint—and more. Because Texas has now "secure[d] outside of litigation all the relief [it] might have won in" the courtroom, this case is moot. *FBI v. Fikre*, 601 U.S. 234, 240 (2024); *see also, e.g., Texas v. HHS*, No. 23-cv-22-DC, 2024 WL 1493809, at *8 (W.D. Tex. Apr. 5, 2024) (Counts, J.) ("Defendants are right; when one side gives the other everything it asks for, that renders the case moot. Plaintiffs have received everything they asked for; they should take the win.").

### C. Defendants have made a judicially enforceable commitment to maintain the recent improvements to SAVE.

The reasons above are more than sufficient to demonstrate that this case is moot. But any doubts were resolved when the United States signed the *Florida* agreement, which obligates DHS to maintain most of the recent improvements to SAVE indefinitely. Among other things, that agreement requires DHS to "ensure that the SAVE system has, at a minimum, the following capabilities":

    a.    Free service for state, territorial, tribal, and local government agencies.

    b.    Integration with the Social Security Administration to allow searches with full Social Security Numbers (SSNs) to be used as a non-DHS enumerator.

    c.    Integration with the Social Security Administration to allow searches with last-four-digits SSNs to be used as a non-DHS enumerator.

    d.    The capacity to process bulk upload verification requests so that users of the system will not need to input verification requests one-by-one.

  e.  The capacity to provide data supporting each verification, and a paper verifiable output that can be relied on by the user, including but not limited to identifying the supporting document type and number queried, and issue date of citizenship where available. This information may be provided by a downloadable .csv file.

  f.  The capacity to obtain U.S. citizenship or immigration-status information, either within 48 hours (for initial verification) or within SAVE's estimated "Additional Verification Response Time," as reported on the SAVE website, (for additional or manual verification), when provided the following data points:

- First name and last name; and

- Date of birth; and

- At least one of the following:

  i. A government-issued immigration enumerator (*e.g.*, A-Number/USCIS Number, SEVIS ID, I-94 Number, Naturalization/Citizenship Certificate Number, Card Number / I-797 Receipt Number, or Visa Number); or

  ii. Other government-issued enumerator permitted by SAVE (*e.g.*, a full SSN, or the last-four-digits of an SSN).

Ex. 3, *Florida* Settlement Agreement ¶ 10. SAVE currently has all these capabilities (and more). *See* Broderick Decl. ¶ 21.

Those contractual commitments have teeth. In dismissing the *Florida* case, at the parties' joint request, Judge Wetherell explicitly retained jurisdiction to enforce the agreement for (at least) 20 years:

> **ORDERED** that the Court retains jurisdiction over this case for a period of twenty years from the date of this order for the purpose of enforcement of the parties' settlement agreement, which is approved by and incorporated by reference into this order. A party may request that the Court extend its jurisdiction if: (1) settlement obligations are not completed within those twenty years; or (2) the party believes it necessary for the Court to continue to retain jurisdiction to enforce the parties' Settlement Agreement. Any such request shall be submitted by motion. Any party may, upon notice, seek to enforce the settlement agreement either by motion or a new action brought in this Court, under the terms set forth in the parties' Settlement Agreement.

Ex. 4, Order, *Florida* ECF No. 31. This long term, judicially enforceable commitment to maintain the recent improvements to SAVE establishes that there is no reasonable expectation that DHS will "return to its old ways." *Fikre*, 601 U.S. at 241. Even if Defendants, one day, wanted to dismantle

13

the recent changes to SAVE—an entirely speculative hypothetical—it would likely be impossible to do so without breaching a judicially enforceable settlement agreement. That confirms that the case is moot.

*       *       *

For all these reasons, this case is moot. But, of course, in the (now unlikely) event that Texas is ever again facing the same problems that led to the filing of this lawsuit, a mootness dismissal would be without prejudice. *See, e.g., Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir. 1994). And unlike the plaintiff States in *Florida*, Texas has not signed any release of any of its claims against the United States arising out of these issues. So even in that (speculative, hypothetical) situation, Texas could simply file a new lawsuit at that time. That is the only proper way to litigate a case like this one—about a concrete dispute, between real adversaries, if and when such a dispute ever actually arises.

## II.    IN THE ALTERNATIVE, AT A MINIMUM, TEXAS SHOULD BE ORDERED TO FILE A NEW COMPLAINT.

Even if this case could somehow escape dismissal for lack of subject-matter jurisdiction under Article III, similar equitable concerns (including principles of prudential mootness, *see supra* at 8-9), at a minimum, warrant an order that Texas file an amended or supplemental complaint. SAVE has changed in many important ways since Texas filed this suit. And the relief requested in Texas's complaint has already been provided. Accordingly, requiring Texas to file a new complaint—identifying any claims that Texas might still assert with respect to the *present* version of SAVE—would promote the efficient administration of justice. It would make little sense for this Court to decide now whether a version of SAVE that no longer exists used to be unlawful. At a minimum, therefore, if the Court does not dismiss this suit, Defendants request that the Court at least order Texas to file a new complaint, including only Texas's claims (if any) challenging the *current* version of SAVE.

## CONCLUSION

For these reasons, this case should be dismissed as moot, in its entirety, for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). In the alternative, at a minimum, Texas should be ordered to file an amended or supplemental complaint.

Dated: December 23, 2025	Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW I. WARDEN
Assistant Branch Director

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI (Florida Bar No. 1041279)
 Senior Trial Counsel
DANIEL RIESS
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8576 (Pezzi)
Tel: (202) 353-3098 (Riess)
Email: stephen.pezzi@usdoj.gov
Email: daniel.riess@usdoj.gov

*Counsel for Defendants*